## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| **JANE DOE,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:19-cv-03125 |
| | ) |
| **MORGAN STATE UNIVERSITY,** | )   **JURY TRIAL DEMANDED** |
| 1700 East Cold Spring Lane | ) |
| Baltimore, MD 21251 | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

Plaintiff Jane Doe,[1] through counsel, states the following as her Complaint for discrimination and retaliation in violation of Title IX of the Education Amendments of 1972 ("Title IX") against Defendant Morgan State University:

## INTRODUCTION

1.      A Morgan State University student attempted to rape Jane Doe in her dorm room in August 2017.  After Doe reported the assault to University administrators, Morgan State issued a no-contact order against her attacker on or about December 7, 2017, and initiated disciplinary proceedings against him.  Unfortunately for Doe, the no-contact order turned out to be a paper shield, and the University's disciplinary process was a farce.  Throughout the academic year, the University refused to take any steps to enforce the no-contact order or to reprimand the assailant for his repeated violations of the order, exposing Doe to continued

---

[1]      Doe files a motion for leave to proceed pseudonymously concurrently with the Complaint.

contact with and harassment by him.  When Doe, a student-athlete, requested measures to protect her safety and well-being and to allow her to participate safely in her sport, her coaches insulted her and refused to help, and she was left vulnerable to harassment by her attacker.  After the University found, following a hearing, that Doe had been sexually assaulted and made a decision to suspend her attacker, the University's Vice President of Student Affairs cast aside the University's rules governing sexual assault complaints and student discipline to see to it that the perpetrator would not face the full consequences of his actions.

2.      As a result of Morgan State University's failure to take meaningful and appropriate action to address the sexual assault and the harassment that followed her report, Doe was forced to leave the sport she loved and which had been central to her education and college experience.  The assault, the University's superficial response, and the sustained hostility she experienced afterwards traumatized her, and to this day, she struggles with the aftermath of the University's failure to take the actions necessary to guarantee her access to educational programs and activities on campus.  Morgan State University's conduct constitutes sex discrimination and retaliation in violation of Title IX.

## PARTIES

3.      Plaintiff Jane Doe is an adult female resident of Baltimore, Maryland.   She attended Morgan State University from August 2014 through December 2018.

4.      Defendant Morgan State University ("Morgan State" or the "University") is a public institution of higher education located at 1700 East Cold Spring Lane, Baltimore, Maryland 21251.

5.      At all relevant times, Morgan State was a recipient of "Federal financial assistance" within the meaning of 20 U.S.C. §§ 1681(a) and 1687(2)(A).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Doe's claims pursuant to 28 U.S.C. § 1331 because the matter in controversy arises under the laws of the United States, specifically Title IX, 20 U.S.C. §§ 1681–1688.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Morgan State resides within this Court's judicial district and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## FACTS GIVING RISE TO RELIEF

8.      Jane Doe began her studies at Morgan State in August 2014.

9.      Doe enrolled at Morgan State with a full athletic scholarship to participate in the University's Track and Field program ("Track").  She was a competitive long-distance runner and excelled as a member of the Track team.  She regularly won 5,000 meter races and helped raise the team's rankings by running long-distance races during competitions.  Morgan State awarded her several Most Valuable Player awards, and Doe was recognized as the Mid-Eastern Athletic Conference (MEAC) Athlete of the Week multiple times.

10.      Doe loved running Track, and in many ways, being a member of the Track team defined her educational experience at Morgan State.

11.      Being a Track athlete is an immersive experience.  During Doe's time at the University, both male and female Track athletes lived in the same dormitory, where they roomed with other members of the team.  The University required Track athletes to participate in study hall together, and since student-athletes had to schedule their classes around their practices and workouts, they often took the same classes as well.  Their shared schedules also meant that Track

athletes commonly ate together.  Thus, Track athletes spent much of the day with each other, whether at class, study hall, the dining hall, the dormitory, practice, or competition.

12.    On or about August 18, 2017, a male Morgan State Track student-athlete ("the Assailant") attempted to rape Doe.  That day, the Assailant came to Doe's dorm room to pressure her into a sexual relationship, which she rejected.  During the conversation, the Assailant sat next to Doe on her bed and began to touch her without her consent while she resisted.  He pulled her onto his lap, and she jumped off the bed and began to walk away.  The Assailant came up behind her suddenly and pulled down her pants and underwear.  He then held her against the bed from behind while he groped her exposed lower body.  Doe felt terrified and believed the Assailant intended to rape her.

13.    Doe managed to struggle away and pull up her pants.  She tried to put some distance between herself and the Assailant, and he trailed her around the room while trying to kiss her and quiet her down.  Doe turned and saw the Assailant holding his erect penis.  Doe left the room and escaped to the in-suite common bathroom.  The Assailant followed her there, shut the door behind him, and resumed trying to kiss her without consent.  Doe told him the bathroom door did not lock, and he left the bathroom and the suite.

14.    Roughly one week later, Doe saw the Assailant in the common area of her suite chatting with her suitemates.  Doe felt alarmed at seeing him and suspected that his true reason for being there was to see her again, as he generally did not socialize with her suitemates.  Soon after seeing the Assailant in the common area, Doe confided in a suitemate that he had made unwelcome advances towards her and asked her not to allow him into the suite again.

15.    In November 2017, Doe disclosed that she had nearly been raped to her older sister, who told their mother, June Smith, about the assault.

16.     On November 30, 2017, Smith met with Morgan State Director of Intercollegiate Athletics Edward Scott and Assistant Athletic Director for Compliance Erlease Wagner and informed them that the Assailant had sexually assaulted Doe earlier in the semester.  Mr. Scott told Smith that he would forward the information to University Title IX Coordinator Tanyka Barber, who would follow up directly with Doe.  He also told Smith that he would inform the Track leadership and ensure that they took steps to keep the Assailant away from Doe at practices and at an upcoming meet.

17.     In a November 30, 2017 email, Ms. Barber asked Doe to contact her and articulated Morgan State's stated policy prohibiting retaliation against those who report or file complaints of sexual misconduct.

18.     During an in-person meeting days later, Ms. Barber told Doe she had two options, which Ms. Barber described as follows: either file a report with the Office of Diversity and Equal Employment Opportunity (the Title IX office), which would result in a lengthy investigation; or file a report with the Office of Student Rights and Responsibilities, which would result in a faster resolution.  Doe chose the latter because Ms. Barber told her it would be faster.

19.     On December 7, 2017, Doe met with Jason Casares, a University employee assigned to investigate her report of attempted rape.  Doe explained that she and the Assailant interacted often because they were both Track athletes and thus trained together, traveled together for competitions, shared hotels at distant competitions, lived in the same dormitory, and had a common group of friends.  Doe wanted to put measures in place to keep the Assailant away from her, such as separate training times, so that she could continue her education without fear.

20.     Mr. Casares issued a no-contact order to the Assailant on December 7, prohibiting him from contacting Doe "either directly or indirectly, in any form" and from engaging in "personal contact" with her, including "being in her presence."  The no-contact order advised the Assailant that his failure to obey the order "will result in an interim suspension . . . and/or additional code of conduct charges."

21.     Doe felt a sense of relief at the entry of the no-contact order because the Assailant and his friends had harassed and demeaned her throughout the Fall semester.

22.     Beginning in or around September 2017, the Assailant told other Track athletes that Doe was falsely accusing him of sexual assault, leading some of those student-athletes to express hostility toward her and to shun her.  For example, one Track athlete told Doe that he was excluding her from a party to welcome freshmen Track athletes because he wanted the Assailant to be there.  On a separate occasion, the same person said in front of Doe and other students that he was "not gonna leave you two lovebirds together," referring to Doe and the perpetrator of her assault.

23.     In October, Doe was visiting her boyfriend, who was also a Track athlete, at the Morgan View Apartments, an off-campus student housing provider predominantly for Morgan State students.  An unknown person vandalized the building's elevator with graffiti consisting of a name similar to the Assailant's and the word "rape" written multiple times.  Another Track athlete took a photograph of the graffiti and sent it to the men's Track group chat.  Later, Doe's boyfriend showed her text messages from the Assailant to the entire men's Track team calling Doe a "f—king liar" and other abusive names.

24.     Following the Assailant's example, his girlfriend (who was also a Track athlete) exhibited open hostility toward Doe and accused Doe of lying about the Assailant's behavior.

25.     Doe hoped the no-contact order would put an end to the harassment and enable her to continue her education in peace.

26.     Doe informed Mr. Casares of the distribution of the photograph and the harassing and abusive messages the Assailant had written about her in the men's Track team group chat.

27.     Doe later expressed concern to Mr. Casares as to how the no-contact order would be enforced during Track competitions, given that the manner in which the team traveled required Doe to be in close proximity to the Assailant.  Doe explained to Mr. Casares that she felt unsafe traveling to Track competitions alongside the Assailant and wanted measures for travel and accommodations to ensure her safety and well-being.  Specifically, Doe wanted safeguards in place for an upcoming competition at Yale University on December 9, her first of the season.

28.     Soon thereafter, Mr. Casares held a meeting with Mr. Scott, Ms. Wagner, Head Track and Field Coach Neville Hodge, Assistant Coach Janice Smythe, and weightlifting trainer Thomas DiStasio to discuss Doe's complaint against the Assailant, the no-contact order, and her request for interim safety measures.

29.     After the meeting, Mr. Casares told Doe that Head Coach Hodge seemed dismissive of the issues raised in their conversation and paid little or no attention to Mr. Casares' explanation of Doe's need for protection from the Assailant or the existence of the no-contact order.

30.     After hearing about Coach Hodge's reaction, Doe decided not to attend the Yale competition because she did not feel she would be safe there.  She requested that Mr. Casares relay that information to the Track staff.

31.     On December 8, Assistant Coach Antonio Wells sent Doe a text message to ask why she was not going to the Yale meet.  Doe perceived that Coach Wells was upset with her because he believed she was not taking Track seriously, when nothing could have been further from the truth.

32.     Coach Wells later texted Doe to inform her that he had spoken to Coach Smythe, who told him only, "[T]hat girl got a lot going on personally."  Later that evening, Coach Wells texted Doe that he had spoken to Head Coach Hodge, who had said, "[H]e's not allowed to speak on it but you [Doe] have a lot going on and that you couldn't go [to Yale] because of issues pertaining to what he couldn't speak on."

33.     The University's failure to disseminate necessary information relating to Doe's requests for safety measures to the members of the coaching staff reflected its disinterest in doing what was necessary to avoid excluding her from Track.

34.     The Assailant competed in the Yale meet.  He won first place in three events. MEAC later named him Athlete of the Week.

35.     Doe did not compete in the Yale meet.

36.     During the following week, the coaching staff did nothing to keep Doe and the Assailant separated during training and other Track activities despite the no-contact order.  The University did not provide Doe and the Assailant with separate training times.  As a consequence, not only was the Assailant frequently in close proximity with Doe in violation of the no-contact order, but he also took advantage of Track activities to further harass and intimidate her.

37.     For example, one day, while Doe was running laps during practice, the Assailant stood in her lane with his hands on his waist, blocking her path.  He refused to give way as she approached him, causing her to leave her lane to avoid a collision.

38.     On another occasion, Doe was in the training room alone using an exercise bike when Coach Smythe brought the Assailant and other sprinters to the training room for an exercise during which the sprinters would take turns running on the treadmills.  While waiting for his turns, the Assailant chose to stand directly over Doe even though there was ample space to stand elsewhere.  Doe felt distressed, but she continued her workout because she was determined to participate fully in Track.

39.     Another time, the Assailant approached Doe while she was gathering her things after a weightlifting session and aggressively bumped his shoulder into her while saying, "Excuse you."

40.     Although these public, intentional violations of the no-contact order occurred in the presence of Track team coaches and staff, they did nothing to stop the violations when they occurred, to prevent the Assailant from breaching the order, or otherwise to enforce the order.

41.     Doe told Mr. Casares about the Assailant's repeated violations of the no-contact order as well, but to no avail.  The University did not take any steps to enforce the order.

42.     The University's toothless response to Doe's report of attempted rape, including its failure to enforce the no-contact order, exposed Doe to these and other incidents of harassment and intimidation by the Assailant.

43.     While at home during winter break, Doe was anxious about the prospect of practicing and competing alongside the Assailant during the upcoming season without appropriate safety measures in place.

44.     Head Coach Hodge expected Doe and her teammates to return to campus for training on January 3, 2018, almost three weeks prior to the first day of classes for the Spring 2018 semester on January 22. Few other students would be on campus during that time.

45.     Doe felt unsafe being around the Assailant on a largely-empty campus and knew that the Winter training schedule would cause them to come into contact with each other more frequently than while school was in session. The Track staff had done nothing up to that point to protect her from continued harassment or to ensure her safety and welfare, despite Assailant's flagrant violations of the no-contact order. Moreover, she perceived, based on her coaches' inaction and their words, that the Track staff considered her near-rape at the hands of her teammate to be a trivial personal problem rather than a safety concern and that the University would not do anything to help her participate in Track safely. For these reasons, Doe determined she could not return to campus on January 3.

46.     Doe texted Head Coach Hodge to inform him that she would return on January 22 because she was "not ready to compete." Coach Hodge insisted she return to campus early, responding that he "was informed by my supervisor that we must arrangement [sic] for you to return on January 3rd with everyone else" because "only [] those athletes who are injured" could return on January 22.

47.     On or about December 29, Smith and Doe called Coach Hodge to discuss the date of Doe's return. During the call, it was evident to Doe that Coach Hodge was aware of Doe's complaint against the Assailant, and yet he responded angrily to Doe's request to return on January 22. Smith, speaking up for her daughter in in the face of Coach Hodge's impatience and indifference to her needs, explained that Doe felt unsafe on campus with the Assailant and would

feel even more unsafe in early January.  Smith also informed Coach Hodge that Doe did not feel secure going to competitions without a plan in place to protect her from her attacker.

48.     Head Coach Hodge demeaned Smith and Doe's concerns, telling Smith that he was a coach, "not a babysitter," and that he would not "hold her [Doe] on one end and him [the Assailant] on the other so that they don't clash."  Doe understood Coach Hodge's comments to show he had no intention of doing anything to allow Doe to train and compete safely.  Coach Hodge ended the conversation by telling Doe and her mother that Doe must return on January 3 and to speak with Mr. Scott if they had any concerns.

49.     Doe and Smith then called Mr. Scott, who did not respond.  They then called Ms. Wagner.

50.     Ms. Wagner returned their call, and Smith explained to her that Doe was afraid and unprepared to return to campus early without appropriate safeguards and that Coach Hodge was refusing Doe's request to return on January 22.  Ms. Wagner responded that she would reach out to Coach Hodge and told them Doe could return on January 22.

51.     Doe returned to campus on or before January 22.  At that time, she observed the Assailant practicing with the Track team.

52.     Doe met with Mr. Scott and explained her concern about Head Coach Hodge's callous response to her report of sexual assault and her request to return on January 22, in addition to his unwillingness to implement safety measures to allow her to practice and compete. Mr. Scott responded only that he would speak to Coach Hodge.

53.     Mr. Scott made no efforts to ensure the University implemented safety measures to allow Doe to participate in Track.

54.     Because the University would neither enforce the no-contact order nor otherwise ensure she could participate safely and without harassment, Doe was excluded from Track. Doe hoped that after the hearing on the Assailant's misconduct, the University would finally take action to enable her to participate in Track. Doe missed a significant number of competitions during the Spring semester, which was to be her last semester as a Track athlete.

55.     Had Morgan State enforced the no-contact order, Doe would have continued to participate in Track.

56.     As the date of the disciplinary hearing approached, many of Doe's teammates, several of whom were to be witnesses at the hearing, stopped speaking with her to punish her for having initiated the disciplinary process against the Assailant.

57.     On February 20, 2018, a three-member student panel and Defendant's Chief Judicial Officer Seymour Chambers led a more than four-hour hearing concerning the Assailant's sexual assault of Doe. The panel heard testimony from at least seven witnesses, including Doe and the Assailant, and reviewed documentary evidence.

58.     During the hearing, the Assailant admitted to facts constituting sexual assault. Specifically, he "admitted to grabbing [Doe's] waist"; "admitted that she said stop"; and "admitted to touching [her] again."

59.     On February 22, Mr. Casares informed Doe that the panel found the Assailant responsible for sexual misconduct and suspended him from February 22, 2018, through January 4, 2019. The panel also kept the no-contact order in place.

60.     Under the Code of Student Conduct, suspension means "[s]eparation of the student from the University for a specified period" and results in the withdrawal of the student

from the University. A suspended student is "barred from University premises" and "shall not participate in any University-sponsored activity."

61.     The suspension thus meant the Assailant was ineligible to continue his studies, be present on campus, or participate in Track through January 4, 2019.

62.     As permitted under the Code of Student Conduct, the Assailant appealed the panel's decision to the University's Vice President of Student Affairs, Dr. Kevin Banks.

63.     On March 21, 2018, Mr. Casares telephoned Doe to inform her that Dr. Banks had affirmed the panel's finding and sanction. In a March 22 email memorializing the call, Mr. Casares wrote, "There are no other forms of appeal available for this matter. Therefore, the decision is now final."

64.     Doe was relieved that her case was over, the decision was final, and the Assailant would be barred from campus for the rest of her time at the University. With him gone, Doe planned to return to Track.

65.     On March 26, however, Doe received an email from Dr. Banks asking for a meeting concerning her case. Dr. Banks wrote:

> Please be informed that I am holding the sanction of suspension in abeyance (on hold) while I reconsider information that was presented to me today regarding the hearing process and I conduct additional interviews with you and several witnesses from the hearing.
>
> Please be informed that I am only allowing [the Assailant] to go to class pending my additional review of this matter. It is my goal to conclude this process this week.

66.     Nothing in the Code of Student Conduct authorized Dr. Banks to hold a sanction that had been affirmed on appeal in abeyance or to "reconsider" new information.

Case 1:19-cv-03125-GLR   Document 1   Filed 10/28/19   Page 14 of 23


67.     Doe responded, "I thought the results after the appeal were final?  That is what I was told, so why are the protocols not followed?"  Dr. Banks told her he would "explain [the] decision" at a later meeting.

68.     On March 30, Dr. Banks emailed Doe that he was "upholding the suspension" and that the "suspension will remain through the summer and fall semester of 2018."  Even though a suspension requires the separation of the student from Morgan State and results in the student's withdrawal, Dr. Banks wrote nonetheless that he was "considering allowing" the Assailant "to complete his classes online" should "his professors allow him to" do so.  Dr. Banks made this decision without having interviewed Doe.

69.     Doe responded that day, "I was guaranteed that after the hearing and the appeal that this situation would have been over.  How is he able to complete classes when he is suspended?"  Dr. Banks never answered her question.

70.     The Assailant was present on campus and participated in Track throughout the appellate process, including the entire month of March.  Doe would see the Assailant all over campus: on her way to and from classes; in her residence hall; in the dining hall; and on the path to the laundry facility.  Whenever the Assailant was near her in violation of the no-contact order, Doe felt anxious and afraid.

71.     On information and belief, around the time Dr. Banks "reopened" the investigation on March 26, the Assailant traveled to Gainesville, Florida, with the Track team to participate in the Pepsi Florida Relays.  Further, on March 31, 2018—the day after Dr. Banks "uph[e]ld[] the suspension"—the Assailant competed for Morgan State in an event at the Pepsi Florida Relays.  Doe did not compete in that meet or any other meet during the Spring 2018 semester.

14

72.     Doe met with Ms. Barber on April 3, 2018, to seek clarity on Dr. Banks's decision and the University's policies and procedures concerning the Assailant's appeal.  Ms. Barber directed Doe to speak with Dr. Banks directly.

73.     Doe met with Dr. Banks on or about April 4, 2018.  Dr. Banks asked Doe to "start from the beginning" and relate to him the facts of her assault.  Doe complied and felt humiliated at being required to relate once again the attempted rape and the hostility from the Track coaches and teammates that had followed.

74.     Throughout the two-hour meeting that followed, Dr. Banks' tone and approach was demeaning, and his remarks showed that he placed the Assailant's interests over Doe's rights.  For instance, Dr. Banks asked her, "Why are you trying to ruin his life?" referring to the Assailant.  He also told her that the Assailant was a "good kid"—seemingly ignoring that the Assailant had sexually assaulted Doe—and a "great student" who was supposed to graduate at the same time as Doe.

75.     Dr. Banks explained that after he had affirmed the Assailant's suspension on March 21, 2018, the Assailant came into his office threatening legal action over the affirmance.  As a result, Dr. Banks said he had reopened the investigation and spoken to witnesses outside Doe's presence.  He also confirmed that he would allow the Assailant to complete his Spring semester classes online.  He did not mention the no-contact order or whether the Assailant would be permitted to continue to participate in Track.

76.     Dr. Banks's conduct was a complete departure from the procedures set forth in the Code of Student Conduct.  The Code does not authorize the Vice President for Student Affairs or any other "appellate bod[y]" to reopen a hearing or take additional evidence at all, much less after the original finding and sanction have been affirmed.  Further, although the Code proscribes

the same person from serving as both the trier of fact and the appellate body, Dr. Banks did exactly that when he first affirmed the panel's decision and then reopened the proceedings to interview witnesses himself.

77.     On April 11, 2018, Dr. Banks again met with Doe and explained that the Assailant would be allowed on campus to take his finals, but that he would be accompanied by a police escort at all times.  Dr. Banks told Doe that he would inform her whenever the Assailant was on campus.

78.     For the rest of the semester, Doe continued to live on campus but was hypervigilant to the threat that the Assailant would appear on campus and approach her again. She remained socially isolated from her roommates, friends, and classmates, all of whom were Track athletes.

79.     In May 2018, Doe saw the Assailant on campus in front of her dorm.  She did not see a police escort.

80.     Doe contacted Dr. Banks on May 28 to inform him that she had seen the Assailant on campus and that she had not received any notification he would be there.  She wrote, "Are you going to allow him to get [away] with breaking the rules again?"

81.     Two days later, Dr. Banks responded to reprimand Doe for not contacting him or the police.

82.     Morgan State did not reprimand the Assailant for entering campus without an escort or for otherwise violating the no contact order.

83.     Doe emailed Dr. Banks on May 31, June 5, and June 6 asking why no one had notified her that the Assailant would be on campus.

84.     Dr. Banks responded on June 6 to inform Doe that the Assailant "was granted permission to come on campus May 11th and May 15th" (but not "to be in the residential area") and to confirm that she had not been notified of his presence on campus on either of those dates.

85.     Dr. Banks was indifferent to Doe's fear that the Assailant could appear on campus at any time and her vulnerability to further harassment from him.

86.     The Assailant received grades for all of his Spring 2018 classes.

87.     Doe's ordeal took a toll on her emotional well-being and her academic performance.  She became anxious, depressed, and withdrawn, and her grades suffered as a result.  She failed one course in Spring 2018 and received a "D" in another in Fall 2018.  She had never before received such poor grades at Morgan State.

88.     Additionally, the profound stress caused by the University's unreasonable response to her sexual assault caused Doe to fail the professional certification exams required to obtain work in her field in the State of Maryland after graduation.  As a result, she has been unable to obtain a permanent job in her field of study.

89.     Although Doe had completed the coursework required to graduate in Spring 2018, she was unable to receive her degree because she did not pass the certification exams.  Thus, she had to take courses at the University for the Fall 2018 semester.

90.     After completing the Spring 2018 semester, Doe moved off campus and in with her mother, who moved to Baltimore so that Doe could live with her, because Doe no longer felt comfortable or safe living on her own.

91.     Due to the University's response, Doe did not feel welcome to rejoin the Track team in Fall 2018, although she was eligible to do so under NCAA rules.

92.     The University conferred Doe's degree on her in the summer of 2019.

93.     Doe continues to experience feelings of shame, profound grief, and powerlessness relative to the attempted rape and Morgan State's response to her reports of sexual assault and harassment on campus.

## COUNT ONE
### Discrimination in Violation of Title IX, 20 U.S.C. §§ 1681–1688

94.     Doe incorporates by reference and re-asserts each of the facts contained in paragraphs 1 through 93 of this Complaint with the same force and vigor as if set out here in full.

95.     A Morgan State student sexually assaulted Doe on campus while she was a student at the University.

96.     Doe's sexual assault was severe, pervasive, objectively offensive, and created a hostile educational environment for her based on her sex, which deprived Doe of equal access to the educational opportunities or benefits provided by the University.

97.     Doe reported the sexual assault to multiple Morgan State administrators and employees who had the authority and ability to investigate and take corrective action to address it.

98.     Multiple Morgan State administrators and employees had actual knowledge of Doe's report of sexual assault.

99.     At all times relevant hereto, Morgan State received federal financial assistance and was obligated to address Doe's sexual assault report because student-on-student sexual assault is a form of sex discrimination under Title IX.

100.    By its acts and omissions, the University was deliberately indifferent to Doe's sexual assault and created a hostile educational environment for her.  Morgan State's deliberate indifference included, without limitation:

     a.  Ignoring Doe's requests for interim safety measures to compete in Track;

    b.   Failing to enforce the no-contact order against the Assailant;

    c.   Excluding Doe from her educational opportunities to advance the Assailant's education, including his continued participation in Track;

    d.   Using harsh and demeaning language to refer to Doe's complaint and request for interim measures;

    e.   Isolating Doe from University activities instead of providing accommodations that would permit her to continue her education in a safe environment;

    f.   Valuing the Assailant's concerns expressed to Dr. Banks over Doe's rights under Title IX;

    g.   Discarding its disciplinary policies to ensure that the Assailant would not face the sanctions imposed by the University during the disciplinary process for sexually assaulting Doe; and

    h.   Failing to take disciplinary action against Doe's assailant.

101.   Morgan State's actions and omissions caused Doe to undergo harassment, embarrassment, and isolation from Morgan State students and made her liable or vulnerable to further harassment, embarrassment, and isolation.

102.   Morgan State's deliberate indifference to Doe's sexual assault deprived her of access to educational opportunities and benefits provided by the University.

103.   As a direct and proximate result of the sex discrimination to which she was subjected, Doe suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to emotional distress, fear, anxiety and trauma; lost earning capacity; and expenses for past and future medical and psychological care.

## COUNT TWO
## Retaliation in Violation of Title IX, 20 U.S.C. §§ 1681–1688

104.    Doe incorporates by reference and re-asserts each of the facts contained in paragraphs 1 through 93 of this Complaint with the same force and vigor as if set out here in full.

105.    Doe engaged in activity protected under Title IX when she reported to Morgan State that she was sexually assaulted on campus by a Morgan State student.

106.    Doe engaged in activity protected under Title IX when she repeatedly asked Morgan State's administrators, employees, and athletics staff for interim safety measures.

107.    Doe engaged in activity protected under Title IX when she participated in the University's process to determine whether the Assailant violated its Code of Student Conduct by sexually assaulting her.

108.    Doe engaged in activity protected under Title IX when she questioned the adequacy and fairness of the University's process in regards to Dr. Banks's "reopening" of the investigation and its failure to enforce the sanctions it imposed against the Assailant.

109.    Morgan State knew about Doe's protected activity because she reported the sexual assault to its administrators and employees and asked the University to take prompt and adequate action to investigate the assault, provide interim safety measures, and sanction the Assailant's conduct.

110.    The University's investigation of and hearings related to Doe's report of sexual assault are indicative of the University's actual notice of the alleged sexual assault.

111.    By its acts and omissions, the University retaliated against Doe because she engaged in activity protected under Title IX.    Defendant's retaliation included, without limitation:

        a.    Ignoring Doe's requests for interim safety measures to compete in Track;

20

b.   Failing to enforce the no-contact order against the Assailant;

c.   Excluding Doe from her educational opportunities to advance the Assailant's education, including his continued participation in Track;

d.   Using harsh and demeaning language to refer to Doe's complaint and request for interim measures;

e.   Isolating Doe from University activities instead of providing accommodations that would permit her to continue her education in a safe environment;

f.   Allowing the Assailant to return to campus unannounced and unescorted despite Doe's ongoing fear for her safety;

g.   Discarding its disciplinary policies to ensure that the Assailant would not face the sanctions imposed by the University during the disciplinary process for sexually assaulting Doe; and

h.   Failing to take disciplinary action against the Assailant.

112.   Morgan State's retaliatory actions and omissions deprived Doe of access to its educational opportunities and benefits.

113.   As a direct and proximate result of the retaliation to which she was subjected, Doe suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to emotional distress, loss of enjoyment of life, fear, anxiety and trauma; lost earning capacity; and expenses for past and future medical and psychological care.

## PRAYER FOR RELIEF

WHEREFORE, the premises considered, Plaintiff Jane Doe respectfully prays that this Honorable Court:

1.       Enter judgment in favor of Plaintiff Jane Doe and against Defendant Morgan State University on all counts contained herein;

2.       Declare Defendant's conduct and treatment of Plaintiff in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688;

3.       Award Plaintiff compensatory damages in an amount to be determined by a jury;

4.       Award Plaintiff reasonable attorneys' fees, costs, expenses, pre-judgment interest, and post-judgment interest; and

5.       Grant such other relief as this Court deems just and proper.


Dated:  October 28, 2019                          CORREIA & PUTH, PLLC


                                                            ___/s/ Linda M. Correia_____
                                                            Linda M. Correia (Bar No. 14560)
                                                            Lauren A. Khouri (Bar No. 19549)
                                                            1400 16th Street, NW, Suite 450
                                                            Washington, DC 20036
                                                            (202) 602-6500 (tel)
                                                            (202) 602-6501 (fax)
                                                            lcorreia@correiaputh.com
                                                            lkhouri@correiaputh.com

                                                            *Counsel for Plaintiff Jane Doe*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  October 28, 2019                    CORREIA & PUTH, PLLC


                                            */s/ Linda M. Correia*
                                            Linda M. Correia (Bar No. 14560)
                                            Lauren A. Khouri (Bar No. 19549)
                                            CORREIA & PUTH, PLLC
                                            1400 16th Street, NW, Suite 450
                                            Washington, DC 20036
                                            (202) 602-6500 (tel)
                                            (202) 602-6501 (fax)
                                            lcorreia@correiaputh.com
                                            lkhouri@correiaputh.com

                                            *Counsel for Plaintiff Jane Doe*