IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JANE DOE,                                    *

     Plaintiff,                           *

v.                                           *                    Civil Action No. GLR-19-3125

MORGAN STATE UNIVERSITY,                     *

     Defendant.                           *
                       ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff Jane Doe's[1] Motion for Partial Summary Judgment (ECF No. 39) and Defendant Morgan State University's ("Morgan State") Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment (ECF No. 45). The Motions are ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part Doe's Motion and deny Morgan State's Motion.

## I.    BACKGROUND

### A.    Factual Background

Doe was a student-athlete at Morgan State who received a full scholarship from the University to compete on its track and field team. (Pl.'s Resume at 2, ECF No. 41-1). She was an award-winning runner who placed a high value on her ability to compete in track. (Id.; Pl.'s Dep. Tr. ["Doe Dep."] at 240:1–13, ECF Nos. 45-3, 50-1). Practicing and

---

[1] The Court granted Doe's Motion to for Leave to Proceed Pseudonymously. (See ECF No. 14).

competing in track and field formed a substantial part of her educational experience at Morgan State. (Id. at 97:22–100:11). All her best friends were other Morgan State track athletes. (Id. at 24:2–6).

On August 18, 2017, Doe was sexually assaulted in her dorm room by another track athlete ("Assailant").[2] Doe describes the assault as follows:

> We were sitting on my bed talking, and I told the Assailant I was not interested in him romantically. The Assailant began pressing his body onto me and touching me. He then pulled me onto his lap. I pulled away and jumped off the bed. He followed me. I walked around to the side of my bed near my roommate's side of the room and he grabbed me, pulled down my pants and underwear, and began running his hands over my legs and genitals. He held me by waist against my bed so that I could not escape. I felt terrified and thought he planned to rape me.
>
> I wriggled away and managed to put a little bit of distance between us. He began trying to kiss me and make me be quiet, saying, "Relax." I kept trying to get away from him, and he kept following me. Someone knocked on the door. He went to a desk and sat down. I answered the door and saw my suitemate Jasmyn Hall, who asked me if I had any hot sauce. I told her, "No, I don't have any," and closed the door. I turned around and saw the Assailant sitting in my desk chair holding his erect penis in his hand. I told him, "You look foolish," and left the room.
>
> After I left the room, I walked to the in-suite common area bathroom, went inside, and sat on the sink counter. The Assailant followed me into the bathroom, stood in front of me, and began trying to kiss me again. I said, "You need to chill because this door doesn't lock." He then left the bathroom.

---

[2] While neither party has formally moved the Court to pseudonymize Assailant, neither party has revealed his identity in their unsealed filings. The Court will not do so on their behalf and will continue to refer to him as "Assailant."

(Pl.'s Answers Def.'s First Set Interrogs. ["Interrog. Answers"] at 2, ECF No. 39-6). Assailant thereafter left Doe's dorm suite. (Doe Dep. at 103:3–8). Doe promptly informed her best friend and her boyfriend that she had been assaulted. (Id. at 103:9–104:12). Doe told her sister about the assault in November 2017, and Doe's sister then informed their mother, June Smith.[3] (Id. at 106:19–107:7). The following day, Smith reported the assault to Edward Scott, Morgan State's Athletic Director, and Erlease Wagner, Deputy Athletic Director and Senior Women's Administrator. (Id. at 107:11–18; Nov. 30, 2017 Wagner Email ["Nov. 30 Email"] at 1, ECF No. 41-3). Smith told Scott and Wagner that Assailant had "pulled [Doe's] pants down, pulled his pants down, turned her over and attempted to penetrate her from the back." (Nov. 30 Email at 1). Smith added that Doe "confided in her older sister last night that she previously told friends." (Id.). That day, Wagner informed Morgan State's Title IX Coordinator, Tanyka Barber, about the report, prompting Barber to speak with Doe on December 1, 2017. (Barber Informal Case Notes ["Barber Notes"] at 1, ECF No. 41-4).

Many of the facts following Doe's report of harassment are in dispute and are described in more detail in Section II.B, infra. Except where indicated, the following facts describing the relevant events underlying Doe's claims are not in genuine dispute and provide an outline for understanding those claims.

On December 1, 2017, following an email exchange with Barber, Scott met with Morgan State Track & Field Head Coach Neville Hodge, Assistant Coach Janice Smythe,

---

[3] The Court also ordered that non-party Smith be identified pseudonymously. (See ECF No. 14).

and Assistant Director for Internal Operations, Shawn Gooden, "and instructed them that [Assailant and Doe] are not to be alone together at practice or any other circumstances until further notice." (Barber-Scott Dec. 1, 2017 Email Exchange ["Dec. 1 Emails"] at 1, ECF No. 46-2; Scott Dec. 1, 2017 Meeting Notes ["Scott Mtg. Notes"] at 1, ECF No. 46-4). Scott, Hodge, and Smythe assert that during the meeting, Scott instructed the coaches to keep Doe and Assailant apart during track practices and events, and the coaches expressed that doing so would not be an issue. (Scott Dep. Tr. ["Scott Dep."] at 26:20–27:1, ECF Nos. 39-23, 45-10; Hodge Dep. Tr. ["Hodge Dep."] at 50:16–51:2, ECF Nos. 39-2, 45-12; Smythe Dep. Tr. ["Smythe Dep."] at 27:1–28:16, ECF No. 45-13).[4]

Scott advised the coaches that if anyone inquired about the reason for separating Doe and Assailant, they should respond that it was "for personal reasons." (Scott Mtg. Notes at 1; Scott Dep. at 28:21–29:5). In his deposition, however, Scott conceded that it was difficult for him or the coaching staff to manage activities that occurred outside the athletic facilities or track events, "because we just don't have jurisdiction over the dorms or the dining halls, or those type of activities that are available to all students on campus." (Scott Dep. at 28:3–10). Hodge relayed Scott's instructions to keep Doe and Assailant separate to Assistant Coach Antonio Wells the following day. (Hodge Dep. at 58:10–59:13).

---

[4] The Court observes that Scott's contemporaneous notes about his instructions to the coaches differ slightly from the coaches' recollections of Scott's directives. Specifically, while Scott's contemporaneous notes reflect that he advised the coaches that Assailant and Doe "are not to be alone together," the coaches testified in their depositions that Scott told them to keep Doe and Assailant "apart"—a distinct instruction.

Doe met with Barber on December 4, 2017 and described her assault as well as Assailant's ongoing harassment of her in the weeks following the assault. (Barber Notes at 1–2). Doe requested that "a no contact order be issued for [Assailant]" and specifically asked (1) that "a schedule be put into place where [Assailant] is not in the same location at the same time when she is practicing," and (2) that "[Assailant] not be present at the same time that she goes to eat." (Barber-Scott Dec. 6, 2017 Email Exchange ["Dec. 6 Emails"] at 5, ECF No. 41-5). Doe "also expressed concerns about potential retaliation/negative treatment she would receive[] from coaches and other athletes." (Id.).

As part of its initial response to Doe's report of her assault, Morgan State issued a no-contact order to Assailant on December 7, 2017. (See No Contact Order at 3, ECF No. 41-9). The no-contact order was a boilerplate order, i.e., it was "the same one [Morgan State] send[s] to everybody." (Casares Dep. Tr. ["Casares Dep."] at 101:8–19, ECF Nos. 39-7, 45-16). Among other things, the order forbade Assailant from "being in [Doe's] presence." (No Contact Order at 3; see also Casares Dep. at 102:7–12).

At least some officials at Morgan State viewed the no-contact order as a "type of interim measure." (Casares Dep. at 101:14–102:12). As part of Morgan State's effort to craft more specific directives for responding to Doe's circumstances—and potentially to issue a second, more specific no-contact order—Morgan State's Title IX Judicial Coordinator, Jason Casares, met with Doe on December 20, 2017, to discuss interim measures that would allow her to return to the track team. (See Hodge-Wagner-Casares-Scott Dec. 20, 2017 Email Exchange ["Dec. 20 Emails"] at 1–2, ECF No. 46-11). In coordination with Doe, Casares drafted a list of detailed directives and emailed it to the

track coaches and other Morgan State officials. (Id.). Despite gathering this information, for reasons that are in dispute and discussed in more detail below, Morgan State did not issue an additional formal no-contact order.

Doe did not return to the Morgan State track team in January 2018. (Hodge-Doe Text Messages at 4, ECF No. 46-14).[5] The parties dispute the reason for her decision. Doe states that she spoke to Barber on December 22, 2017, and stated that she was concerned for her safety. (Doe Dep. at 109:5–18). She also states that when she spoke to Hodge about coming back, she felt that he had "disregarded everything I just said to him about my discomfort of being back on campus without any safety measures." (Id. 154:21–155:7). Morgan State asserts, however, that Doe made her decision not to return to the track team of her own accord and for reasons unrelated to her safety or Morgan State's response to her report. Morgan State cites to text messages Doe sent to Hodge and Casares in which she stated that she is "not coming back on the 3rd" because she is "not ready to [compete]" and "not ready emotionally and physically." (Hodge-Doe Text Messages at 6; Doe-Casares Text Messages at 1, ECF No. 46-15). Morgan State also cites to other evidence indicating that Doe told people she was not "mentally ready" or "mentally in a position" to return to the track team. (See Hodge Dec. 29, 2017 Email at 1, ECF No. 46-16; Wagner Dep. Tr. ["Wagner Dep."] at 226:18–227:19, ECF Nos. 39-11, 45-5).

---

[5] When referencing exhibits without clear pagination, such as this one, citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

In the meantime, Morgan State investigated Doe's assault allegation, assigning Casares as the investigator. (Casares Dep. at 85:10–86:2). On February 9, 2018, following his investigation, Casares sent Assailant a letter charging him with sexual misconduct and violation of Morgan State policies and notifying him of his upcoming student conduct hearing. (Feb. 9, 2018 Letter at 2–3, ECF No. 41-25). The hearing occurred on February 20, 2018. (Id.). At the hearing, Assailant admitted to touching Doe without her consent. (Banks Dep. Tr. ["Banks Dep."] at 15:18–16:6, ECF Nos. 39-3, 45-36). The hearing panel found Assailant responsible for sexual misconduct and suspended him from Morgan State for one year. (Feb. 23, 2018 Letter at 4, ECF No. 41-26). The sanction required Assailant to "withdraw[] from all divisions of the University," prohibited him from "participat[ing] in any University-sponsored activity," and barred him from Morgan State premises. (Id.). Assailant appealed the panel's decision, and Morgan State's Vice President for Student Affairs, Kevin Banks, upheld the decision and the accompanying sanction on March 21, 2018. (Casares Mar. 22, 2018 Email at 1, ECF No. 41-27). In his email informing Doe of Assailant's failed appeal, Casares assured her that "[t]here are no other forms of appeal available for this matter. Therefore, the decision is now final." (Id.).

The following day, Assailant's parents contacted Banks and asked that he reconsider his decision. (Email from Assailant's Parents at 1–2, ECF No. 41-28). Notwithstanding Casares assurances that Banks' decision was final, Banks agreed to meet with Assailant's parents to discuss their concerns. (Id. at 1). Banks then met with Assailant and his mother, who protested the school's decision and made accusations about Doe that appeared designed to challenge her credibility. (See Banks Dep. at 25:14–25:19 (asserting that Doe

was "just trying to get back at" Assailant); Banks Meeting Notes ["Banks Notes"] at 10, ECF No. 41-30 (notes from Banks' meeting with Assailant and his mother twice referencing Doe's use of marijuana)). As a result of the meeting, Banks emailed Doe and informed her that he was "holding the sanction of suspension in abeyance (on hold) while [he] reconsider[ed] information that was presented" to him during his meeting with Assailant and his mother. (Banks Mar. 26, 2018 Email at 1, ECF No. 41-31). Banks conveyed that he would allow Assailant to continue attending class pending completion of this post-appeal review. (Id.).

Following his meeting with Assailant and his mother, Banks conducted an additional interview with Doe. According to Doe, during the interview, Banks gave several indications of sympathy for Assailant, including by insisting that he was a "good kid" and asking Doe "[w]hy [she was] trying to ruin [Assailant's] life." (Doe Dep. at 205:13–22). The following day, the Morgan State Athletic Department requested that Doe come in for a drug test. (Mar. 26, 2018 Text Messages at 2–3, ECF No. 41-34).[6] Moreover, although Banks promised that he would notify Doe when Assailant was on campus—and that Assailant would receive a police escort—he failed to fulfill that promise. (See Banks-Assailant Apr. 30, 2018 Emails at 1, ECF No. 41-36; Doe-Banks May 28, 2018 Emails at 1, ECF No. 41-35; Banks Dep. at 50:5–55:1).

---

[6] Banks and Scott deny that there is a causal relationship between Banks' discovery of Doe's alleged marijuana usage and the subsequent request for a drug test. (See Banks Dep. at 84:9–20; Scott Dep. at 92:6–19).

Banks' decision to revisit Assailant's suspension met with vehement resistance from Casares, Barber, and Seymour Chambers, the three Morgan State administrators responsible for responding to student complaints of sexual assault. For example, Barber wrote that she "completely disagree[d] with this course of action . . . there were no concerns about 'procedural violations.' The matter was handled in accordance with the Office of Diversity and EEO investigation process." (Banks-Barber-Casares May 9–10, 2018 Emails ["May 9–10 Emails"] at 2, ECF No. 41-38). Casares agreed, noting that "ethically I feel the need to speak up . . . . To re-investigate a case, not only falls short of best practice, it is really poor practice." (Id. at 1). Casares asserted that it was "unfair" to subject Doe to another interview and that undoing a decision after both parties had been notified of it was "simply wrong." (Id.). Apparently incredulous, Casares asked what Morgan State could need to reinvestigate given that Assailant had acknowledged that "[Doe] told [him] to stop and [Doe] had her feet on [Assailant's] chest at one point." (Id.). Casares concluded that if Morgan State determined that it needed to conduct additional fact finding, he was "asking to be removed from the case. Ethically and professionally . . . I know better." (Id.).

Doe testified that in the spring semester following her report, she saw Assailant "constantly" and that Assailant attempted to intimidate her by "staring and winking at" her and "locking eyes with" her. (See Doe Dep. at 166:21–172:19). Doe has not competed again since her assault; indeed, she testified that she does not even run anymore. (Id. at 237:19–238:6). Following the assault, she began experiencing panic attacks. (Id. at 238:13–239:16).

**B.** **Procedural History**

Doe filed this lawsuit on October 28, 2019. (ECF No. 1). Doe's two-count Complaint alleges: (1) discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"); and (2) retaliation in violation of Title IX. (Compl. ¶¶ 94–113). She seeks declaratory relief and compensatory damages. (Id. at 22). Morgan State filed its Answer on December 20, 2019. (ECF No. 9).

On November 11, 2020, following discovery, Doe filed a Motion for Partial Summary Judgment. (ECF No. 39). Morgan State filed a Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment on December 23, 2020. (ECF No. 45). Doe filed an Opposition to Morgan State's Motion and Reply in Support of her Motion on January 20, 2021, followed by an amended version of her brief on January 22, 2021. (ECF Nos. 50, 54). Morgan State filed a Reply in support of its Motion on February 9, 2021. (ECF No. 56).

## II.  DISCUSSION

**A.** **Standard of Review**

**1.** **Rule 56**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential

element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 2. Cross-Motions for Summary Judgment

When parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). The Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (citing Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)). If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249–50.

### 3. Partial Motions for Summary Judgment

Parties may also move for summary judgment as to a particular party or a particular element of a claim. See Koepplinger v. Seterus, Inc., No. 1:17CV995, 2020 WL 2063416, at *24 & n.43 (M.D.N.C. Apr. 29, 2020), report and recommendation adopted, 2020 WL

5705915 (M.D.N.C. Aug. 26, 2020); see also Fed.R.Civ.P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); Hudak v. Clark, No. 3:16-CV-288, 2018 WL 1785865, at *2 (M.D.Pa. Apr. 13, 2018) ("Rule 56 contemplates the possibility that summary judgment may be entered on less than a full claim and on one or fewer than all of the elements necessary to establish a claim.").

**B.     Analysis**

The parties in this action have submitted cross-motions for summary judgment. Morgan State seeks summary judgment in its favor as to both of Doe's claims. Doe seeks summary judgment in her favor on her Title IX retaliation claim, and seeks summary judgment as to two elements of her Title IX discrimination claim: "(1) [Doe] was subjected to sexual harassment that was so severe, pervasive, and objectively offensive that it effectively deprived her of equal access to educational opportunities or benefits provided by the school; [and] (2) the school had actual knowledge of the alleged sexual harassment." (Pl.'s Mot. Partial Summ. J. ["Pl.'s Mot."] at 30, ECF No. 39). Because the applicable legal standards and relevant facts underlying both Motions are identical, the Court will organize its analysis by legal subject matter. The Court will, however, "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol, 316 F.3d at 523 (citation and internal quotation marks omitted).

### 1. Title IX Discrimination

To prevail on a Title IX claim premised on sexual harassment or assault, a plaintiff must prove four elements:

> (1) that the educational institution receives federal funds; (2) that the plaintiff "was subjected to harassment based on her sex"; (3) that "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity"; and (4) that "there is a basis for imputing liability to the institution.

Feminist Majority Found. v. Hurley, 911 F.3d 674, 686 (4th Cir. 2018) (quoting Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc)). In order for harassment to be actionable, it must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Id. (quoting Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 633 (1999)). Liability may be imputed to the institution "if 'an official who . . . has authority to address the alleged [harassment] and to institute corrective measures . . . has actual knowledge of [harassment] in the [institution's] programs and fails adequately to respond' or displays 'deliberate indifference' to [harassment]." Jennings, 482 F.3d at 700 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998)).

Morgan State does not dispute that it receives federal funds, nor does it dispute that "[m]ultiple Morgan State administrators and employees had actual knowledge of Doe's report of sexual assault." (Compl. ¶ 98; see Answer ¶ 98, ECF No. 9).[7] Instead, it argues

---

[7] Doe has moved for summary judgment on this element of her Title IX discrimination claim. Finding that Morgan State has not meaningfully contested this element and appears in any event to have admitted it in its Answer, the Court will grant

that there is no genuine dispute of material fact regarding the conclusions that (1) Doe was not subjected to harassment that was sufficiently severe, pervasive, and objectively offensive that it effectively deprived her of access to an educational opportunity or benefit; and (2) Morgan State did not display "deliberate indifference" to the harassment Doe experienced. For her part, Doe argues that there is no genuine dispute of material fact regarding the conclusion that she was subjected to harassment that was sufficiently severe, pervasive, and objectively offensive that it effectively deprived her of access to an educational opportunity or benefit. At bottom, the Court agrees with Doe that there is no dispute that she has established the element of severe or pervasive harassment, and therefore will deny Morgan State's Motion as to Doe's claim of Title IX discrimination.

### a.    Severe or Pervasive Harassment

There is, of course, no question that Doe's assault constituted sexual harassment in the ordinary sense of the term. The question before the Court is whether the harassment meets the high bar established by the Supreme Court and the Fourth Circuit for actionable student-on-student harassment under Title IX. As set forth above, a plaintiff who premises her Title IX discrimination claim on sexual harassment or assault must establish that the harassment she suffered was "so severe, pervasive, and objectively offensive that it

---

summary judgment in Doe's favor as to the "actual knowledge" element of her Title IX discrimination claim. See Doe v. Fairfax Cnty. Sch. Bd., --- F.3d ---, 2021 WL 2446782, at *3 (4th Cir. June 16, 2021) ("[A] school's receipt of a report that can objectively be taken to allege sexual harassment is sufficient to establish actual notice or knowledge under Title IX—regardless of whether school officials subjectively understood the report to allege sexual harassment or whether they believed the alleged harassment actually occurred.").

effectively bars the victim's access to an educational opportunity or benefit." Feminist

Majority Found., 911 F.3d at 686 (quoting Davis, 526 U.S. at 633). A plaintiff may base

such a showing on several forms of evidence, including by establishing that the harassment:

> (1) results in the physical exclusion of the victim from an
> educational program or activity; (2) "so undermines and
> detracts from the victim['s] educational experience" as to
> "effectively den[y her] equal access to an institution's
> resources and opportunities"; or (3) has "a concrete, negative
> effect on [the victim's] ability" to participate in an educational
> program or activity.

Jennings, 482 F.3d at 699 (quoting Davis, 526 U.S. at 650–51).

Doe argues that there is no genuine dispute of material fact that the sexual assault

she experienced had a "concrete, negative effect" on her education or access to school

resources. See Jennings, 482 F.3d at 699–700 (finding sufficient evidence of negative

impact where student-athlete plaintiff presented evidence of harassment that made her feel

humiliated, anxious, uncomfortable, and impacted her participation and performance in

athletics). Doe cites to record evidence showing that (1) "[b]efore the assault, Doe was an

award-winning runner on Morgan's team and after, she did not compete again"; and (2)

after the assault, Doe "received a failing grade in one class and began experiencing panic

attacks." (Pl.'s Mot. at 32).

These facts do not appear to be in genuine dispute. Indeed, Morgan State "does not

dispute the traumatic effect of the underlying sexual assault." (Def.'s Cross-Mot. Summ.

J. & Opp'n Pl.'s Partial Mot. Summ. J. ["Def.'s Mot."] at 30, ECF No. 45-1). Instead,

Morgan State argues that "the question is whether the student is subject to harassment that

is so severe, pervasive and objectively offensive as to deny the student access to

educational opportunities after the school has notice of the harassment and because the school did nothing to stop it[.]" (Id. at 25). In other words, according to Morgan State, any harassment that occurs before the defendant knew that the plaintiff had been the victim of harassment effectively "does not count" for the purposes of establishing this element of a Title IX discrimination claim.

Morgan State's characterization of the law is inaccurate. A plaintiff need not establish that she experienced "severe, pervasive, and objectively offensive" harassment after her initial report to satisfy this element of a Title IX discrimination claim. See Doe v. Fairfax Cnty. Sch. Bd., --- F.3d ---, 2021 WL 2446782, at *12 (4th Cir. June 16, 2021) ("[A] school may be held liable under Title IX based on a single, pre-notice incident of severe sexual harassment, where the school's deliberate indifference to that incident made the plaintiff more vulnerable to future harassment . . . .); see also Farmer v. Kan. State Univ., 918 F.3d 1094, 1104 (10th Cir. 2019) (holding that "a Title IX plaintiff is not required to allege that she suffered actual additional incidents of sexual harassment"); Fitzgerald v. Barnable Sch. Dist. Cmte., 504 F.3d 165, 172–73 (1st Cir. 2007) ("[A] single instance of peer-on-peer harassment theoretically might form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity."), rev'd and remanded on other grnds., 555 U.S. 246 (2009). As the Fourth Circuit has explained:

> Even a single incident of sexual harassment, if sufficiently severe, can inflict serious lasting harms on the victim—physical, psychological, emotional, and social. And where

such harms deprive the victim of the ability to fully participate in or to benefit from the educational opportunities provided by their school, and where this deprivation remains unremedied or is compounded as a result of the school's deliberate indifference, the victim surely is "denied access to educational benefits and opportunities on the basis of gender"—which Title IX clearly prohibits.

Fairfax Cnty., 2021 WL 2446782, at *12 (quoting Davis, 562 U.S. at 650).

Even in the absence of the Fourth Circuit's recent decision, Morgan State's position directly conflicts with the standard for deliberate indifference set forth by the Supreme Court in Davis Next Friend LaShonda D. v. Monroe County Board of Education, 526 U.S. 629 (1999). In Davis, the Supreme Court held that "[i]f a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." 526 U.S. at 644–45 (emphasis added) (quoting Random House Dictionary of the English Language 1415 (1966)). If an educational institution may be liable solely because its deliberate indifference made a student more vulnerable to harassment—expressly distinguished by the Davis Court from causing a student to undergo harassment—then there can be no requirement for additional harassment under Davis. See Takla v. Regents of the Univ. of Cal., No. 215CV04418CASSHX, 2015 WL 6755190, at *4 (C.D.Cal. Nov. 2, 2015) ("[T]he phrase 'make them liable or vulnerable' would be redundant if construed to require further harassment[.]"). Accordingly, the Court rejects Morgan State's argument that Doe was required to identify post-notice harassment to satisfy this element of her Title IX discrimination claim, and will grant Doe's Motion as to this element.

To prevent ambiguity, this holding does not grant summary judgment to either party on the question of whether any actions or inactions taken by Morgan State, Assailant, or any other non-parties after Doe's assault constituted harassment sufficient to satisfy this element of Doe's discrimination claim. Rather, the Court finds only that there remains no genuine dispute of material fact regarding whether Doe suffered harassment that was "so severe, pervasive, and objectively offensive that it effectively bar[red] [Doe's] access to an educational opportunity or benefit" when Assailant sexually assaulted her. The Court therefore grants Doe's Motion as to this element.

### b. Deliberate Indifference

Morgan State moves for summary judgment on Doe's Title IX discrimination claim on the basis that she has failed to introduce evidence on which a reasonable jury could conclude Morgan State was deliberately indifferent to her complaints of sexual assault and ongoing harassment. At bottom, the Court disagrees and will deny Morgan State's Motion as to Doe's claim of discrimination.

As set forth above, "[i]f a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subject[s] its students to harassment. That is, the deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." Davis, 526 U.S. at 644–45 (citation and internal quotation marks omitted). Under Davis, an educational institution may be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648.

Although this is a "high bar," the Fourth Circuit has emphasized that it is not true "that only a complete failure to act can constitute deliberate indifference, or that any half-hearted investigation or remedial action will suffice to shield a school from liability." S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty., 819 F.3d 69, 77 (4th Cir. 2016). Rather, the Fourth Circuit requires that schools "engage in efforts that [are] 'reasonably calculated to end [the] harassment.'" Feminist Majority Found., 911 F.3d at 689 (quoting Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 669 (2d Cir. 2012)). The Fourth Circuit has cautioned, however, that "school administrators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student bullying or harassment, and a school's actions do not become 'clearly unreasonable' simply because a victim or his parents advocated for stronger remedial measures." S.B. ex rel. A.L., 819 F.3d at 77 (citations omitted).

Doe primarily relies on three categories of evidence to establish that a triable issue of fact exists as to her claim of deliberate indifference: (1) Morgan State's failure to issue a second no-contact order or implement the injunctions discussed during Doe's December 20, 2017 conversation with Casares, including by failing to separate Doe from Assailant; (2) Morgan State's actions after initially denying Assailant's appeal—most notably Banks' decision to partially reverse Assailant's sanction; and (3) Hodge's post-report hostility toward Doe. The Court will review these categories in turn.

### i. The No-Contact Order

Morgan State argues that Doe cannot rely on Morgan State's failure to issue a second no-contact order and to implement the measures Doe discussed with Casares during

their December 20, 2017 meeting as evidence of deliberate indifference because: (a) even though Morgan State did not formalize Doe's safety requests into a second no-contact order, it communicated the directives to those individuals who needed to know them and Morgan State officials were fully prepared to implement them; (b) Doe voluntarily declined to return to the track team, thus depriving Morgan State of the chance to implement the measures; and (c) Doe has not identified any legal authority requiring an individually tailored no-contact order in cases of sexual misconduct. Morgan State argues that even if it ought to have issued a second no-contact order, "such failure would constitute, at most, negligence and not deliberate indifference." (Def.'s Mot. at 29).

It is worthwhile to provide context for Morgan State's decision not to issue a second no-contact order. As set forth above, Morgan State issued a boilerplate no-contact order to Assailant on December 7, 2017. A jury could conclude that the boilerplate order was facially impracticable; among other things, it forbade Assailant from "being in [Doe's] presence," arguably an impossibility if the two of them were to remain on the track team during the pendency of Morgan State's investigation. (No Contact Order at 3; see also Casares Dep. at 102:7–12). Moreover, around the time the order was issued, Scott acknowledged that the no-contact order would not apply everywhere, noting that "it's not possible to control the eating and travel (mode of transportation) conditions." (Barber-Scott Dec. 6–14, 2017 Email Exchange ["Dec. 6–14 Emails"] at 1, ECF No. 41-10; see also Dec. 20 Emails at 3 ("I have advised Ms. Barber that the students all ride on the same bus and that we have no other mechanism to separate the two parties during the actual transportation aspect of team trips."). Indeed, the unsuitability of the initial no-contact

order to guide Morgan State's response to Doe's complaint was made apparent by an email from Hodge on December 20, 2017, in which he writes, "I am not bring[ing] back [Doe] on January 3, 2017 [sic] unless I get clarification from [Wagner]." (Dec. 20 Emails at 4–5).

Doe has adduced evidence that Morgan State thus viewed the no-contact order as a "type of interim measure." (Casares Dep. at 101:14–102:12). Because of this, Morgan State set about gathering information necessary to draft an additional no-contact order containing "the specifics . . . e.g. are there scheduled times for the practices, weight room, eating, etc." (Dec. 6–14 Emails at 1; see also Casares Dec. 14, 2017 Email at 1, ECF No. 41-11 ("I assume the 'stay away order' will be sent after the details are shared regarding times/days of practices, etc?"); Casares Dep. at 101:8–102:12 (discussing gathering additional information to supplement initial no-contact order)). As part of Morgan State's effort to craft more specific directives for responding to Doe's report, Casares met with Doe on December 20, 2017, to discuss interim measures that would allow her to return to the track team. (See Dec. 20 Emails at 1–2). In coordination with Doe, Casares drafted a list of detailed directives and emailed it to the track coaches and other Morgan State officials. (Id.).

Despite gathering this information, Morgan State did not issue an additional no-contact order. Casares asserts that he is "sure he would have" communicated the detailed directives to Assailant, but there is no documentary evidence that he did so, nor can he recall when or in what manner he relayed the instructions. (Casares Dep. at 157:15–158:21). According to Barber, there were no subsequent communications regarding

formalizing the directives contained in Casares' email because Doe declined to return to the track team for the spring semester. (Barber Dep. Tr. ["Barber Dep."] at 137:1–9, ECF Nos. 39-12, 45-7).

Morgan State also cites to the depositions of Wagner, Hodge, and Scott for the assertion that "they were fully prepared to implement the measures to keep Doe and the Assailant separate during practices, travel, and meets." (Def.'s Mot. at 10). However, the depositions Morgan State cites offer only tepid support for this position. For instance, in the portion of Scott's deposition cited by Morgan State, Scott states only that "it was [his] understanding that these interim measures or provisions were put in place at the request of Ms. Doe with [sic] her meeting with Mr. Casares, and the athletic department's role was to facilitate these [measures]." (Scott Dep. at 50:1–5). Morgan State also cites a portion of Wagner's deposition in which she testifies she believed "that those present [in a December 8, 2017 meeting] were all on the same page about how the track team would be moving forward to ensure Jane Doe and the assailant were separated." (Wagner Dep. at 169:20–170:3). But as discussed above, twelve days after that December 8 meeting, Hodge protested that he could not bring Doe back without additional clarification from Wagner, and Casares met with Doe to gather additional information regarding the specifics of managing her return to the team. A reasonable jury could therefore conclude that Wagner's testimony about Morgan State's confidence in handling Doe's return as of December 8, 2017 was misguided.[8]

_____

[8] Further, Doe testified that Assailant repeatedly violated the no-contact order. (See Doe Dep. at 166:21–172:19 (describing seeing Assailant "constantly" and Assailant

Viewing this evidence in the light most favorable to Doe, the Court finds that there is a genuine dispute as to whether Morgan State had implemented or was prepared to implement the additional protective measures Doe requested during her meeting with Casares. And while it may be true that a "school's actions do not become 'clearly unreasonable' simply because a victim or his parents advocated for stronger remedial measures," S.B. ex rel. A.L., 819 F.3d at 77 (citations omitted), there is ample testimony in the record suggesting that Morgan State itself viewed the initial no-contact order as an interim measure that needed to be supplemented in order to be effective. Accordingly, a reasonable jury could conclude that its failure to do so was clearly unreasonable.

The Court is similarly unpersuaded by Morgan State's position that it did not need to implement an additional no-contact order because Doe declined to return to track. The argument poses something of a "the chicken or the egg" quandary: did Doe refuse to return to track because she reasonably feared that Morgan State was failing to implement or formalize additional measures to ensure her safety, or did Morgan State decline to

---

attempting to intimidate her by "staring and winking at" her and "locking eyes with" her)). Morgan State argues that "it was not a violation of the no contact order for the Assailant to be on campus or even in the same building or room with Doe, as long as he did not speak to her." (Def.'s Mot. at 15 n.11). But the plain language of the no-contact order—which prohibited Assailant from being in Doe's "presence," (No Contact Order at 3)—contradicts Morgan State's position. A reasonable jury could conclude that Morgan State's inability to secure Assailant's compliance with the initial no-contact order suggested that Morgan State was not prepared to implement the measures discussed by Doe and Casares. See Pogorzelska v. VanderCook Coll. of Music, 442 F.Supp.3d 1054, 1064 (N.D.Ill. 2020) ("[T]he pleaded fact that [the college] determined that [the assailant] was 'guilty but not guilty' of sexual assault yet declined to enforce its own No Contact Order is enough to state a Title IX claim as those actions (or inactions) could plausibly be clearly unreasonable under the known circumstances[.]").

implement or formalize additional measures to ensure Doe's safety because she refused to return to track? Initially, the Court notes that according to Doe, Morgan State did not expressly communicate to her what measures it put in place to protect her. (Doe Dep. at 152:3–10). Moreover, when she and her mother asked Hodge about implementing the measures, he allegedly responded with mockery, including by asserting that he was "not a babysitter" and by asking whether he was supposed to "hold [Doe and Assailant] on two different ends [of the track] so they won't clash." (Id. at 152:16–153:16).

Morgan State maintains that Doe made her decision not to return to the track team of her own accord and for reasons unrelated to her safety or Morgan State's response to her report. Morgan State cites to text messages Doe sent to Hodge and Casares in which she stated that she is "not coming back on the 3rd" because she is "not ready to [compete]" and "not ready emotionally and physically." (Hodge-Doe Text Messages at 6; Doe-Casares Text Messages at 1). Morgan State also points to evidence from Morgan State officials suggesting that Doe was not "mentally ready" or "mentally in a position" to return to the track team. (See Hodge Dec. 29, 2017 Email at 1; Wagner Dep. at 226:18–227:19). Morgan State further highlights testimony from Casares and Wagner in which they stated that Doe denied feeling unsafe. (Casares Dep. at 126:3–20, 178:7–182:13; Wagner Dep. at 239:4–240:17).

Doe's testimony cuts against the testimony of the Morgan State officials. For instance, Doe cites her December 22, 2017 conversation with Barber, in which she stated that she was concerned for her safety. (Doe Dep. at 109:5–18). She also states that following her conversation with Hodge about returning to track, she felt that he had

"disregarded everything I just said to him about my discomfort of being back on campus without any safety measures." (Id. at 154:21–155:7). Her conversation with Hodge "made [her] understand that he really didn't care for my safety or well-being." (Id. at 153:11–14). Doe also asserts that her reasons for not being "mentally ready" were that "this case [was] still being under investigation," she "consistently kept seeing the assailant practicing," and she "was so much in fear throughout the rest of [her] time in school." (Id. at 155:16–156:1). Once again, viewing this evidence in the light most favorable to Doe, a reasonable jury could conclude that Doe declined to return to the track team because she reasonably feared that Morgan State had failed to implement meaningful measures to ensure her safety, and that such a failure was clearly unreasonable in light of the circumstances.

The Court will also briefly address Morgan State's argument that Doe has not identified legal authority requiring an individually tailored no-contact order in cases of sexual misconduct. The Court is not aware of any such authority. However, such a requirement is not necessary for Doe to survive summary judgment. Doe has adduced evidence plausibly suggesting that Morgan State put in place an impracticable no-contact order; that its own officials recognized that the no-contact order was insufficient and impracticable; and that its own officials recognized the need for supplemental directives and undertook efforts to craft those directives. A reasonable jury could find that Morgan State's own officials felt a bespoke no-contact order was necessary under the circumstances and its failure to issue such an order was clearly unreasonable. Moreover, a reasonable jury could conclude that the peculiar relationship between teammates on a collegiate sports team requires a university faced with an allegation that one teammate assaulted another to

take more precautions than usual in order to "engage in efforts that [are] 'reasonably calculated to end [the] harassment.'" <u>Feminist Majority Found.</u>, 911 F.3d at 689 (quoting <u>Zeno</u>, 702 F.3d at 669). In sum, the Court finds that there is a genuine dispute of material fact regarding whether Morgan State's failure to issue a second no-contact order was clearly unreasonable and whether the measures Morgan State put in place following Doe's report were reasonably calculated to end her harassment. Thus, a triable issue of fact exists as to Doe's claim of deliberate indifference.

### ii. Banks' Post-Appeal Reversal

Doe argues that Banks' decision to partially lift the sanction on Assailant, in contravention of Morgan State policy, was another clearly unreasonable decision that demonstrates Morgan State was deliberately indifferent to her report of harassment. Morgan State argues that Banks' decision to modify Assailant's sanction following Assailant's initial appeal cannot constitute deliberate indifference because an institution's "failure to comply with its own administrative policies does not amount to deliberate indifference, and Doe suffered no harassment as the result of Banks' modification of the Assailant's suspension." (Def.'s Mot. at 29–30). At bottom, the Court finds that triable issues of fact exist as to whether Banks' actions were clearly unreasonable under the circumstances and whether those actions support a finding of deliberate indifference.

The Court has set forth the relevant facts concerning the investigation, appeal, and Banks' post-appeal conduct above. The Court notes, however, that the oppositional emails from Casares and Barber, (<u>see</u> May 9–10 Emails at 1–2), were even more remarkable in light of their subordinate status to Banks, a vice president at Morgan State. In his

deposition, Casares added that "when you suspend someone and you allow them to complete classes but you hold their suspension until they are done sort of defeats the purposes of holding people accountable." (Casares Dep. at 241:13–21). Chambers noted that he could not recall another instance in which Banks had revisited a closed appeal in this manner. (Chambers Dep. Tr. ["Chambers Dep."] at 65:13–19, ECF No. 39-53).

The Court finds that a reasonable jury reviewing this evidence could determine that Banks' unprecedented decision to go outside of Morgan State policy—and to undertake a course of action that an experienced Title IX investigator, Casares, described as unethical, "unfair," "really poor practice," and "simply wrong"—in the service of second-guessing the sanction against Assailant was clearly unreasonable under the circumstances. Moreover, given that Banks' decision had the effect of allowing Assailant to return to Morgan State's campus, and given that Banks failed to adhere to his guarantee that he would notify Doe when Assailant did so, a reasonable jury could find that the decision made Doe more vulnerable to harassment. Accordingly, the Court finds that Doe has presented sufficient evidence to create a genuine dispute of material fact as to whether Banks' actions to revisit Assailant's suspension represented deliberate indifference to Doe's report of harassment.

### iii.     Hodge's Hostility

Doe relies in part on Hodge's hostility toward her following her report of assault to establish her claims of discrimination and retaliation. See Fairfax Cnty., 2021 WL 2446782, at *10–11 (citing evidence of hostile and trivializing remarks following plaintiff's report of an assault as evidence of deliberate indifference). Morgan State argues

that Hodge's alleged hostility toward Doe following her report cannot constitute evidence of deliberate indifference because Hodge was unfriendly to Doe prior to her report. Specifically, Morgan State points to testimony from Doe in which she stated that prior to her assault, she found Hodge "very hostile," "difficult," "very stern," and uncaring, and that she "truly felt disliked by him." (Def.'s Mot. at 21 (citing Doe Dep. at 91:14–95:1)).[9] In addition, Morgan State argues that mere hostility is insufficient to constitute deliberate indifference.

With respect to Hodge's prior behavior, the Fourth Circuit has rejected similar arguments in the context of Title VII discrimination claims. In E.E.O.C. v. Fairbrook Medical Clinic, P.A., 609 F.3d 320 (4th Cir. 2010), the court considered an "equal opportunity jerk" argument, where the defendant argued that a supervisor "did not make offensive comments to [plaintiff] because of her sex," but because he "was a generally crude person who made vulgar comments to men and women alike." Id. at 327. The Fourth Circuit "easily dismissed" this argument, finding that "[a]lthough [the supervisor] made offensive remarks in front of both male and female audiences, his use of sex-specific and derogatory terms indicates that he intended to demean women." Id. (citation and internal quotation marks omitted). Similarly, while Hodge may have behaved in a hostile manner toward Doe in the past, the specific substance of his hostile remarks following her report—that he was "not a babysitter," and his mocking query concerning whether he was supposed

---

[9] Morgan State has not provided the Court with pages 93 through 95 of Doe's deposition transcript and the Court cannot verify that Doe referred to Hodge as "difficult" or "very stern."

to "hold [Doe and Assailant] on two different ends [of the track] so they won't clash," (Doe Dep. at 153:5–16)—relate directly to her report. This apparent hostility toward Doe's report was bolstered by Casares's deposition testimony, in which he provided his impression that Hodge "wasn't taking [Doe's report] seriously" and that he was "somewhat dismissive when we had a conversation with him about it." (Casares Dep. at 114:22–115:11). Casares added that Hodge later told him that "he thought [Doe] wasn't telling the truth." (Id. at 198:14–22). Accordingly, while Hodge's previous behavior toward Doe may mitigate the strength of this evidence, it by no means discounts it entirely.

Morgan State's argument that mere hostility is insufficient to constitute deliberate indifference is similarly unavailing. Morgan State cites to several out-of-circuit cases in support of this argument. See, e.g., Stiles ex rel. D.S. v. Grainger County, Tenn., 819 F.3d 834, 849 (6th Cir. 2016) (allegations that school officials "made rude or critical comments, offered unhelpful suggestions, and acted disrespectfully" did not create a triable issue as to whether school was deliberately indifferent). Doe does not attempt, however, to rely on this fact alone to make out her claim of deliberate indifference. Hodge's alleged hostility toward Doe's report is one piece of evidence in the broader mosaic of Doe's allegations of deliberate indifference. It is probative for this purpose. See Jennings, 482 F.3d at 700 (relying in part on evidence of "dismiss[iveness]" toward plaintiff's complaint of harassment in finding a triable issue of fact on deliberate indifference). Accordingly, Morgan State's arguments on this point must fail.

### iv. Holistic Review

Finally, the Court notes that Morgan State's arguments generally seek to isolate specific potential deficiencies in its response to Doe's complaints and argue that those alleged deficiencies are not sufficient to establish that it was deliberately indifferent. As set forth above, the Court disagrees and finds that a reasonable jury may find certain categories of actions or inactions identified by Doe as "clearly unreasonable" under the circumstances. Importantly, however, the Court also finds that a reasonable jury could take a holistic view of Morgan State's series of alleged missteps and find that together they amount to "an official decision . . . not to remedy [a Title IX] violation." Davis, 526 U.S. at 642 (citing Gebser, 524 U.S. at 290); see also Fairfax Cnty., 2021 WL 2446782, at *11 n.11 (finding that although the record "contains evidence showing that the school provided a number of accommodations requested by Doe" following her report, those accommodations did not support a finding that no reasonable jury could find deliberate indifference "when the record as a whole is viewed in the light most favorable to Doe"). The Court finds that a triable issue of fact exists regarding whether these actions—setting aside the question of whether Doe experienced post-report harassment[10]—made Doe more vulnerable to harassment. For these reasons, the Court will deny Morgan State's Motion as to Doe's claim of discrimination.

---

[10] Because the Court finds that Doe does not need to demonstrate that she suffered additional harassment following her sexual assault, see Section II.B.1.a, supra, the Court does not reach the question of whether the incidents Doe describes following her report meet the standard of actionable harassment under Title IX.

## 2.    Title IX Retaliation

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination" prohibited under Title IX. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005). In order to state a prima facie case of retaliation under Title IX, a plaintiff must establish three elements: (1) she engaged in protected activity under Title IX; (2) the defendant took an adverse action against her; and (3) there was a causal connection between her protected activity and the adverse action. Feminist Majority Found., 911 F.3d at 694. "To be actionable, the retaliatory conduct must be 'materially adverse'; that is, it must suffice to 'dissuade[ ] a reasonable [person] from making or supporting a charge of discrimination.'" Id. (quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006)). Moreover, plaintiffs seeking to establish a Title IX retaliation claim in the Fourth Circuit "must show a retaliatory motive." Id. at 696 (citing Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)).

The parties do not contest that Doe engaged in protected activity.[11] Instead, Morgan State argues that there is no genuine dispute of material fact regarding the conclusions that (1) Doe did not suffer an actionable adverse action under Title IX; and (2) Doe cannot establish a causal connection between her protected activity and any adverse actions she experienced. Doe argues the opposite: that there is no genuine dispute of material fact

---

[11] Doe did not move for summary judgment as to individual elements of her retaliation claim. Accordingly, although the matter does not appear to be in dispute, the Court will not sua sponte grant partial summary judgment as to this element.

regarding the conclusions that (1) Doe did suffer actionable adverse actions under Title IX; and (2) there is a causal connection between the adverse actions she experienced and her protected activity. At bottom, the Court disagrees with both movants and will deny the Motions as to Doe's claim of Title IX retaliation.

### a.      Adverse Action

Doe's retaliation claim is premised on essentially the same actions and inactions that form the basis for her deliberate indifference claim. As an initial matter, the Court notes that there is nothing wrong with a plaintiff relying on the same facts to support her claims of discrimination and retaliation. See Feminist Majority Found., 911 F.3d at 696 (noting that plaintiffs can plead "multiple" claims "based on the same facts" and that doing so was "not duplicative"); Doe 1 v. Howard Univ., 396 F.Supp.3d 126, 147 (D.D.C. 2019) ("The definition of an adverse action would be meaningless if plaintiffs were unable to use actions taken by schools to form the bases of both retaliation and deliberate indifference claims."), motion to certify appeal granted, reconsideration denied, No. 17-CV-870 (TSC), 2019 WL 4860717 (D.D.C. Oct. 1, 2019), appeal dismissed, No. 19-7163, 2020 WL 2611030 (D.C. Cir. Apr. 20, 2020).

As set forth above, the Court rejected Morgan State's Motion as to Doe's claim of discrimination upon finding that triable issues of fact exist as to whether it was deliberately indifferent to Doe's claims of harassment. To the Court's knowledge, the Fourth Circuit has not squarely addressed whether inaction may constitute an "adverse action" for the purposes of a retaliation claim. In the absence of Fourth Circuit guidance, the Court finds that inaction of the type that formed the basis for Doe's deliberate indifference claim may

constitute an "adverse action" for the purpose of her retaliation claim. See Doe 1, 396 F.Supp.3d at 147; Lewis v. D.C., 885 F.Supp.2d 421, 428 (D.D.C. 2012) (finding that inaction could form basis for Title VII retaliation claim); Bos. Exec. Helicopters, LLC v. Town of Norwood, No. CV 15-13647-RGS, 2017 WL 5195867, at *4 (D.Mass. Nov. 9, 2017) (permitting institutional inaction to serve as adverse action for First Amendment retaliation claim); Carter v. Toyota Motor Mfg., Ky., Inc., No. CV 5: 15-373-DCR, 2017 WL 2111642, at *16 n.23 (E.D.Ky. May 15, 2017) (finding in Title VII retaliation claim that "[r]etaliation requires an adverse action of the employer, or at least employer inaction in the face of employee misconduct"). Indeed, as one state supreme court has persuasively written:

> [W]e differ with the view that wrongful omissions are of less effect in law, and attended by less serious consequences, than positive wrongdoing. Action, where legal duty requires no action, is no worse than inaction where legal duty requires action. There is no difference in law or morals between the effects attending the two. Negligence more frequently accompanies omission than commission; but whatever its cause, its legal consequences are the same.

Taylor v. N. States Power Co., 264 N.W. 139, 142 (Minn. 1935). Here, the "inaction" plausibly portrayed by the facts in evidence was not merely passive or ignorant neglect; rather, it was partial action by Morgan State followed by an alleged failure to follow through on its obligations. Inaction in the face of a known obligation to act is an affirmative decision and not meaningfully distinguishable in this context from an action. The Court thus finds that this form of inaction may suffice to constitute an adverse action for the purposes of Doe's Title IX retaliation claim.

Moreover, even if the Court were to find that each individual action was not significant enough to constitute an adverse action, "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be de minimis if considered in isolation." Brennan v. Norton, 350 F.3d 399, 422 (3d Cir. 2003); see also Smith v. Vilsack, 832 F.Supp.2d 573, 586 (D.Md. 2011) (finding in the context of a Title VII retaliation claim that "a court may consider the cumulative effect of several allegedly retaliatory acts without converting the claim into a hostile work environment claim"). Here, the Court is satisfied that Doe has introduced sufficient evidence of Morgan State's actions and inactions following her report of discrimination that, taken together, raise a triable issue of fact as to whether she suffered an adverse action.

Thus, for the reasons set forth above, the Court finds that viewed in the light most favorable to Doe, there exists a triable issue of fact as to whether the actions and inactions underlying Doe's claim of deliberate indifference are sufficient to dissuade a reasonable person from making a charge of discrimination. On the other hand, viewing the facts in the record in the light most favorable to Morgan State, the Court finds that a reasonable jury could conclude that Doe did not suffer an adverse action following her report of discrimination. For example, a reasonable jury could conclude that Morgan State's failure to issue a second no-contact order had no material impact on Doe; that Doe's decision not to return to track was not related to any action or inaction on Morgan State's part; or that Banks' decisions with respect to Assailant's sanctions did not materially affect Doe. Accordingly, the Court will reject both parties' Motions as to whether Doe suffered an

adverse action for the purposes of her retaliation claim. The question of whether Doe suffered an adverse action must be left to a jury.

        **b.**    **Causation**

On their face, of course, Morgan State's actions and inactions are necessarily causally related to Doe's protected activity in that they would not have occurred but for her protected activity. In the Fourth Circuit, however, plaintiffs seeking to establish causation for their Title IX retaliation claims "must show a retaliatory motive." Feminist Majority Found., 911 F.3d at 696 (citing Guessous, 828 F.3d at 216). At bottom, the Court finds that triable issues of fact exist as to this element and will decline to grant either party summary judgment on this element of Doe's claim of Title IX retaliation.

Doe points primarily to two factors as evidence of a retaliatory motive on the part of Morgan State: Hodge's hostility toward her following and in response to her report, and Banks' deviation from Morgan State's policies in staying and partially reversing Assailant's sanction after denying his appeal. The Court will consider these in turn.

Doe argues that Hodge's hostility toward her following and in response to her report is evidence that Morgan State's actions were motivated by discriminatory animus. See Driskell v. Summit Contracting Grp., Inc., 828 F.App'x 858, 869 (4th Cir. 2020) (finding that "lackluster investigation of [plaintiff's] complaints" and "hostility toward" plaintiff's reports and complaints supported causation element of wrongful discharge claim); Jensen v. IOC Black Hawk Cnty. Inc., 745 F.App'x 651, 653 (8th Cir. 2018) (citing "animus towards [plaintiff] because of the [sexual harassment] complaint" as a possible source of causation evidence). The Court agrees. Hostility toward a complainant in the wake of

protected activity is archetypal evidence of retaliatory animus. Moreover, as discussed above, Hodge directly referenced Doe's report of harassment and request for protection from Assailant in his alleged dismissive and derogatory remarks toward her. This further strengthens Doe's argument that Hodge's hostility related to her report of harassment. See Wang v. Nev. Sys. of Higher Educ., No. 318CV00075MMDCBC, 2018 WL 5816647, at *7 (D.Nev. Nov. 6, 2018) (granting summary judgment to plaintiff on retaliation claim where plaintiff had introduced undisputed evidence showing that defendant referenced plaintiff's protected activity in its adverse action).[12] Thus, the Court finds that there are sufficient triable issues of fact concerning Hodge's alleged hostility toward Doe in the wake of her reports to prohibit entry of summary judgment to Morgan State on this element.

Next, Doe argues that Banks' deviation from Morgan State's policies in staying and partially reversing Assailant's sanction after denying his appeal raises a triable issue of fact regarding discriminatory motive. See Stiles v. Gen. Elec. Co., 986 F.2d 1415, 1993 WL 46889, at *4 (4th Cir. 1993) ("[E]vidence indicating that [defendant] failed to follow established procedures helps [plaintiff] to raise a genuine dispute over whether [defendant's] stated reasons for his discharge were pretextual."). Morgan State has not substantively contested this point in the context of Doe's retaliation claim. The Court finds that at the summary judgment stage, when viewed in conjunction with other evidence suggestive of retaliatory animus on the part of Morgan State officials, this evidence is

---

[12] The Court notes that Hodge denies making the "babysitter" comment. (See Hodge Dep. at 94:10–96:1).

sufficient to introduce a triable issue of fact as to whether Morgan State was motivated by retaliatory animus when it took the adverse actions described above.

On the other hand, the Court is similarly persuaded that Doe's evidence of retaliatory motive is insufficient to find that she has established causation as a matter of law. A reasonable jury could conclude that Hodge's hostility toward Doe predated her report and was not caused by her report and that Banks' deviation from Morgan State policy related to a genuine concern about the procedure the school followed in its investigation, rather than a retaliatory motive. Accordingly, the Court will deny Doe's Motion to the extent it argues that she is entitled to summary judgment on this element of her claim of retaliation.

### c. Pretext

Morgan State further asserts that Doe's retaliation claim should be dismissed because Doe has failed to meet her obligations under the burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). As set forth above, the Court finds that Doe has adduced evidence sufficient to create triable issues of fact as to all elements of her prima facie case of retaliation. Under McDonnell Douglas, "once a prima facie case of retaliation is established, the burden of production shifts to the defendant to offer a legitimate, non-retaliatory reason for its adverse employment action." Goodman v. Archbishop Curley High Sch., Inc., 149 F.Supp.3d 577, 582 (D.Md. 2016). (citing O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996)). "If the employer fulfills this reciprocal duty, the burden reverts back to the plaintiff to establish that the defendant's proffered reason is pretextual and that her termination was in

fact retaliatory." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507–08 (1993)).[13]

Morgan State argues that it has proffered legitimate, non-discriminatory reasons for the adverse actions and inactions underlying Doe's claims of deliberate indifference and retaliation, and that Doe has failed to demonstrate that its reasons were pretextual. The Court disagrees. The argument—and the Court's conclusion—is essentially a redux of the discussion surrounding deliberate indifference. For the same reasons that the Court found that a reasonable jury could determine Morgan State's actions and inactions following Doe's report were clearly unreasonable, the Court concludes that a reasonable jury could find that Morgan State's proffered reasons for those actions and inactions were not true, and that the real reasons were rooted in a retaliatory motive. See Stennis v. Bowie State Univ., No. PX-16-1362, 2019 WL 1507777, at *10 (D.Md. Apr. 5, 2019) (finding that a "failure to abide by regular procedures" was "probative of pretext"); Stiles, 1993 WL 46889, at *4 ("[E]vidence indicating that [defendant] failed to follow established procedures helps [plaintiff] to raise a genuine dispute over whether [defendant's] stated reasons for his discharge were pretextual."); Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1286 (9th Cir. 2001) (finding that a supervisor's "exasperation, lack

---

[13] The Court notes that under McDonnell Douglas, a plaintiff is generally only obliged to introduce evidence of the falsity of a defendant's proffered reason in cases "where . . . the record contains no direct evidence of retaliation." Goodman, 149 F.Supp.3d at 582 (emphasis added). The Court declines to decide whether Doe has introduced direct evidence of retaliation because it finds that, in any event, she has met her burden under the McDonnell Douglas framework.

of sympathy, and even animosity toward" the plaintiff in the wake of her protected activity supported a finding of pretext).

The Court thus finds that triable issues of fact exist as to whether Morgan State has proffered legitimate, non-discriminatory, and non-pretextual reasons for its alleged mishandling of Doe's report of harassment and its subsequent investigation. Accordingly, the Court declines to grant summary judgment to Morgan State on Doe's Title IX retaliation claim on this basis.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Doe's Motion for Partial Summary Judgment (ECF No. 39) and deny Morgan State's Cross Motion for Summary Judgment (ECF No. 45). A separate Order follows.

Entered this 21st day of June, 2021.


_____/s/_____
George L. Russell, III
United States District Judge